## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| DR. DEREK MELBY, DR. DANILO POLICARPIO, DR. DAVID GUILLOT, DR. JAIDEEP PATEL, et al., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:17-cv-155-M (Consolidated with Nos. 3:17-cv-732-M; 3:17-cv-868-M; and 3:17-cv-963-M) |
| AMERICA'S MHT, INC., ASCENTIUM CAPITAL LLC, CLIFF MCKENZIE, SCOTT POSTLE, BALBOA CAPITAL CORPORATION, and UNIVEST CAPITAL, INC., | § § § § § § | |
| Defendants. | § | |

## ORDER

Before the Court is Plaintiffs' Motion for Final Approval of Partial Class Action Settlement. (ECF No. 90). For the reasons stated below and on the record, the Motion is **GRANTED**.

## I.    Factual and Procedural Background

### a.    Alleged Fraudulent Scheme

Starting in 2011, America's MHT, Inc. represented to physicians that it operated a network of patient-recruitment coordinators, nurse practitioners, and other administrative staff in cities throughout the United States. (Am. Compl. ¶¶ 15-16, ECF No. 57). MHT offered to sell physicians its Medical Home Team Service Program ("Program"), through which physicians would supervise nurse practitioners who provided home health care in the physician's region. (*Id.* ¶ 15). In turn, MHT represented that participating physicians would receive "hundreds of thousands of dollars per year" in profit. (*Id.* ¶ 17).

As part of a physician's participation in the Program, MHT required that a limited liability company be created to handle the Program's financing, which purportedly would be used to pay licenses, software, and other operational costs. (Am. Compl. ¶ 21-24). MHT would create the LLC and list the physician as the LLC's sole member. (*Id.* ¶ 25). MHT represented that it would handle all aspects of managing the LLC and that the physician would have no responsibility, liability, or accountability for the LLC. (*Id.* ¶ 24). Pursuant to the terms of the Program, the physician—and in some cases, the physician's business association, business partner, or family member—entered into Installment Payment Agreements ("IPAs") and received financing from one or more of three lenders: Ascentium Capital LLC, Balboa Capital Corporation, or Univest Capital, Inc. (collectively, the "Lenders"). (*Id.* ¶ 31; Massey Decl. ¶ 14, ECF No. 91). Most physicians entered into four IPAs, sometimes totaling more than $450,000 in loan obligations. (Am. Compl. ¶¶ 42; Massey Decl. ¶ 15). Under the IPAs, payments were made directly by the Lenders to MHT on behalf of the LLCs. (Am Compl. ¶¶ 31, 38). The physicians allege that much of the payments were not used to support the Program, but instead "siphoned off" to enrich MHT and its employees. (*See, e.g.*, *id.* ¶¶ 52-53). In May 2017, MHT filed for Chapter 7 bankruptcy, leaving the physicians with substantial debt obligations under the IPAs. (*Id.* ¶ 210).

The physicians subsequently filed suits against MHT, the Lenders, Ascentium employee Cliff McKenzie, and MHT representative Scott Postle. These suits were consolidated into this class action. (*See* ECF Nos. 1, 40, 57, 69). Plaintiffs assert claims for violations of the Texas Deceptive Trade Practices Act ("TDTPA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO") based on Defendants' involvement in the alleged fraudulent scheme. (*See* Am. Compl. ¶¶ 260-72, 297-323). They also seek a declaratory judgment that the IPAs are unenforceable under various theories. (*Id.* ¶¶ 273-96).

### b.  Proposed Settlement

On September 26, 2017, Plaintiffs filed a Stipulation of Settlement and a Motion for Preliminary Approval of Partial Class Action Settlement.  (ECF No. 59).  The settlement seeks to resolve the claims of all class members against Ascentium, Univest, and McKenzie only ("Settling Defendants").  The settlement defines the class as every person who is currently listed in Ascentium's, Univest's, Balboa's, or MHT's books and records as a guarantor or owner of a "Doctor LLC."  (Stipulation at 7, ECF No. 59-1).  "Doctor LLC" is defined as an LLC created by MHT for physicians participating in the Program.  (*Id.* at 4).  The class is further divided into four subclasses:

- Subclass One includes every class member who is not a guarantor of a Univest IPA, but is a guarantor of an Ascentium IPA, with a book date of January 1, 2016, or later, and an outstanding balance as of August 31, 2017 (*id.* at 7);

- Subclass Two includes every class member who is a guarantor of both a Univest IPA and an Ascentium IPA, with a book date of January 1, 2016, or later, and an outstanding balance as of August 31, 2017 (*id.* at 7–8);

- Subclass Three includes every class member who is a guarantor of an Ascentium IPA, with a book date of December 31, 2015, or earlier, and an outstanding balance as of August 31, 2017 (*id.* at 8); and

- Subclass Four includes every class member who not a guarantor of a Univest or an Ascentium IPA, but is a guarantor of a Balboa IPA (*id.* at 8).

In exchange for a release of claims against the Settling Defendants, the Stipulation provides that:

- Ascentium will pay (1) the expenses of the settlement administrator, and (2) the fees and costs of class counsel (Stipulation at 9);

- Each member of Subclass One and Subclass Two will have the member's outstanding loan obligation reduced to the lesser of (1) $85,900.50 and (2) 80% of the total of all payments remaining due under the original terms of all Ascentium and Univest IPAs for which the class member is listed as a guarantor, with each class member receiving an additional 20% discount on the agreed loan obligation if paying in one lump sum (*id.* at 12-13);

- Each member of Subclass Three will have the member's outstanding loan obligation reduced to the lesser of (1) $114,534.00 and (2) 80% of the total of all payments

remaining due under the original terms of all Ascentium and Univest IPAs for which the class member is listed as a guarantor, with each class member receiving an additional 20% discount on the agreed loan obligation if paying in one lump sum (*id.* at 13);

- Each member of Subclass Four will receive payments from Ascentium based on a formula, which, at the member's election, can be used to pay outstanding loan obligations to Balboa (*id.* at 10);

- Class members from Subclasses One, Two, and Three will be released from any claims and obligations arising under the Ascentium and Univest IPAs after payment in full of their agreed loan obligations discussed above (*id.* at 10);

- Ascentium and Univest will (1) refrain from any negative credit reporting against members of Subclasses One, Two, and Three for acts predating the settlement; (2) retract any negative credit report that was previously made against members of Subclasses One, Two, and Three; and (3) refrain from any further collection efforts against members of Subclasses One, Two, and Three so long as the terms of the agreed settlement amount are satisfied (*id.* at 9);

On November 22, 2017, the Court conditionally certified the proposed class and subclasses and granted preliminary approval of the settlement. (ECF No. 64).

On December 20, 2017, the settlement administrator mailed notice forms to 206 potential class members and, if known, also to their attorneys. (Kopperud Decl. ¶ 13, ECF No. 94). On December 27, 2017, the settlement administrator mailed the notice forms to an additional seventy-three potential class members that were businesses, and to their attorneys, if they were known. (*Id.* ¶ 14). From these mailings, twenty-five notice forms were returned as undeliverable. (*Id.* ¶ 16). After additional research, the administrator determined updated addresses for the intended recipients and promptly re-mailed the forms. (*Id.* ¶ 16). The settlement administrator also set up a website, which provided detailed information regarding the case and the proposed settlement, (*id.* ¶¶ 10-12), and a toll-free number, which received over forty calls about the case, (*id.* ¶ 18).

Seventy-eight class members timely requested to opt out of the settlement, (Kopperud Decl. ¶ 19), but eight of those later withdrew their opt-out request, (Leu Suppl. Decl. ¶ 8, ECF

No. 106).  Another two class members untimely requested to opt out, but the parties agreed to recognize and honor their requests.  (*Id.* ¶ 7).  Accordingly, seventy-two persons opted out and will not be bound by the settlement.

Eleven class members filed objections to the terms of the settlement.[1]  (*See* ECF Nos. 73–79, 85, 88, 89).  Nearly all objectors noted that the tax implications of the settlement were unclear, and all objectors argued that the provisions of the settlement obligating them to additional payments on the IPAs would cause them financial hardship, unless the loan obligations due under the settlement were further reduced or eliminated.  (*See, e.g.*, Dr. Mann Obj., ECF No. 76 (requesting that no class member pay more than $50,000 over a 5-year payout with no interest)).  With the exception of Dr. Babajide Obiesesan, who requested that the Court reject the settlement outright, the objectors requested that the Court amend the terms or that the parties renegotiate the amount due.  (*See, e.g.*, ECF No. 79).  Prior to the fairness hearing, class counsel contacted the objectors and attempted to respond to their concerns.  Class counsel also retained an outside accountant to address the tax implications of the settlement.  (*See* ECF No. 91 at App. 39–40).  As a result, the accountant opined that the class members "should not have a tax consequence as a result of the forgiveness or discharge of the alleged Ascentium and/or Univest guarantees," and that interest "paid or accrued within the taxable year on indebtedness" could be deducted.  (*Id.*)

On March 12, 2018, the Court held a fairness hearing.  Two of the representative Plaintiffs, Dr. Derek Melby and Dr. David Guillot, testified that they thought the settlement was

---

[1] The following class members objected: Dannielle Green, Alton Moore, II, Christopher Mann, Samson Sheih, Christopher Chapman, Tri Nguyen, Joseph Shaun Murphy, Quynh Ton-That, Babajide Obiesesan, Kerisea McPherson, and Rafael Lagleva.  (*See* ECF Nos. 73–79, 85, 88, 89).  Jack Pieniazek also objected, but he is not listed as a member of the class and thus lacks standing to object.  (ECF No. 96 (listing all potential class members)); *Feder v. Electronic Data Systems Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) ("[O]nly class members have standing to object to a settlement.").  James Aurand and Renda Joy Holladay also objected, but they have opted out and thus lack standing to object since the settlement will not bind them.  *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 936 (E.D. La. 2012), *aff'd sub nom.*, *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014).

fair, reasonable, and adequate, and that it should be approved. In particular, Dr. Guillot, who is a member of Subclass Three and hence would receive lower reduction in debt compared to members of Subclasses One and Two, testified that the settlement was fair and reasonable. (Hrg. Tr. at 89:22-90:23; *see also* Guillot Aff. ¶ 18, ECF No. 102).

Several other class members—Drs. Babajide Obiesesan, Anila Khan, and Christopher Mann—also testified. Dr. Obiesesan, one of the objectors, testified that the settlement was unfair because it provided disproportional benefits to class members. He acknowledged, however, that he had not opted out because he thought it would be more expensive to litigate on his own. Dr. Obiesesan agreed that he would be bound to pay the negotiated loan obligation if the Court approved the settlement. Dr. Khan testified that the settlement was unfair because it required her to pay an amount despite the fact that she "ha[sn't] done anything wrong." (Hrg. Tr. at 121:16). Like Dr. Obiesesan, she acknowledged that she had not opted out because she thought it would be more expensive to litigate on her own. Dr. Khan declined to say whether she opposed the settlement if it was not renegotiated. Dr. Mann testified that the settlement was unfair to the doctors, because they were victims. He acknowledged that he had not opted out, because he believed that the settlement would allow him and his family eventually to obtain "peace and relief from this terrible situation." (*Id.* at 123:20-21).

## II.    Class Certification

### a.    Legal Standard

A settlement class must meet the requirements for class certification, just as if the case were to be litigated. *See Amchem v. Windsor,* 521 U.S. 591, 620 (1997).[2]  In fact, the requirements of Rule 23 "demand undiluted, even heightened, attention in the settlement context

---

[2] *See also Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 324 (N.D. Tex. 2011) (analyzing a settlement class under Rule 23 prior to final approval of settlement); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *12 (N.D. Tex. Nov. 8, 2005) (same).

. . . [because] a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

To certify a class, a party must first demonstrate that the proposed class meets the four threshold requirements specified in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation. *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,* 695 F.3d 330, 345 (5th Cir. 2012). The party must then demonstrate that the proposed class meets one of three categories specified in Rule 23(b). *Id.* Plaintiffs here seek to certify the class under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy."[3] FED. R. CIV. P. 23(b)(3). Courts have "great discretion in certifying and managing a class action." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 624 (5th Cir. 1999).

For the reasons stated below, Plaintiffs have satisfied each of the requirements for class certification.

    **b. Analysis**

        **i. Rule 23(a) Requirements**

            **1. Numerosity**

This requirement is met when "the class is so numerous that the joinder of all members would be impracticable." FED. R. CIV. P. 23(a)(1). The proposed class is composed of 279 class members. This size is comparable to or greater than the size of classes certified by other courts in the Fifth Circuit. *See, e.g.*, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th

---

[3] Plaintiffs also seek to certify the class under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). However, here, in addition to injunctive relief, class members seek individualized monetary relief. Accordingly, certification under Rule 23(b)(2) is inappropriate. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-01 (2011) (holding that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages").

Cir. 1999) (holding that a putative class of 100 to 150 members "is within the range that generally satisfies the numerosity requirement"). In addition, joinder would be difficult because the proposed class members are geographically diverse. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004) ("Likewise, the possible geographic diversity among potential plaintiffs weighs heavily in favor of class treatment.").

### 2. Commonality

This requirement is met when there is at least one issue of law or fact that, if resolved, would affect a significant number of the proposed class members. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (citing FED. R. CIV. P. 23(a)(2)). Courts have often found this requirement met when class members are alleged victims of a common course of fraudulent conduct. *See, e.g., Schwartz*, 2005 WL 3148350, at *13. Here, Plaintiffs allege that the class members are victims of MHT's fraudulent scheme perpetrated through a common pattern of misrepresentations. Class members share many issues, such as the common misrepresentations made by MHT to all participating physicians, and the scope of the other Defendants' involvement in MHT's scheme.

### 3. Typicality

This requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3); *see also Mullen,* 186 F.3d at 625 (holding that typicality exists when the claims of named and unnamed plaintiffs have a common source and rest upon similar legal and remedial theories). Typicality does not mean that the claims of the representative parties must be identical to those of the absent members. *See Ligon v. Frito–Lay, Inc.,* 82 F.R.D. 42, 47 (N.D. Tex. 1979) (requiring that "a class representative and a class member . . . be similarly, not identically, situated"). The class members and the representative Plaintiffs in this case are pursuing claims based on the same

legal theory: they were allegedly defrauded into executing IPAs through a common pattern of misrepresentations.  Furthermore, all class members seek similar injunctive, declaratory, and monetary relief.

### 4.    Adequacy of Representation

This requirement is met when (1) class counsel prosecute the action zealously and competently; (2) representative parties are willing and able to take an active role in and control the litigation and protect the interests of absentee class members; and (3) there are no conflicts of interest between the representative parties and the class members.  *See Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017); *see also* FED. R. CIV. P. 23(a)(4).  Class counsel here have demonstrated that they are qualified, experienced, and able to conduct this litigation. (ECF No. 59-2).  The representative Plaintiffs will fairly and adequately protect and pursue the interest of the class.  No conflict of interest exists between the representative Plaintiffs and the class.

### ii.    Rule 23(b)(3) Requirements

### 1.    Predominance

This requirement is met where common issues predominate over individual ones. *Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir. 1986) ("The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless.").  However, Rule 23(b)(3) does not require all questions of law or fact be common.  *See also Longden v. Sunderman*, 123 F.R.D. 547, 556 (N.D. Tex. 1988) ("To be sure, individual issues will likely arise in this as in all class action cases[, but] to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").

Dispositive issues of law and fact are common to all class members, and these questions predominate over any individual questions.  Defendants' liabilities are based on MHT's alleged

fraudulent scheme implemented through misrepresentations made to all class members. *See Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *7 (N.D. Tex. Aug. 4, 2011) (finding predominance requirement met because "[t]his case involves misrepresentations or omissions made regarding the same investments . . . [and] [t]hese identical or near-identical alleged misrepresentations or omissions are not only significant but pivotal to the class members' claims and the analysis of each would be remarkably similar"); *Amchem*, 521 U.S. at 625 (noting that the predominance requirement is "readily met in certain cases alleging consumer or securities fraud").

Plaintiffs also allege that this fraudulent scheme included MHT forging class members' signatures on IPAs and related agreements, often without notifying them of the resulting loan obligations (Am. Compl. ¶¶ 42, 44–46); recruiting physicians to join the Program so that it could obtain financing on their behalves (*id.* ¶¶ 21, 56, 95, 122–24, 156, 157, 213); recruiting physicians in the Program through referral bonuses similar in structure to a pyramid scheme (*id.* ¶¶ 58–60, 95, 213); and clandestinely siphoning funds from the physicians' LLC accounts for improper use (*id.* ¶¶ 51, 52, 84, 97, 125, 183). Based on evidence supporting these allegations, class members can establish that the Program was "inherently fraudulent"—thus a per se predicate act of racketeering activity necessary for a RICO claim—without needing to address individual instances of fraud. *See Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639-40 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 76 (2017). Because a "common course of conduct provide[s] a class-wide basis for deciding the predominant class issues of fact and law," the requirement is met. *See Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008).

Although there will be individualized analyses of damages, in that each class member has different loan obligations, the Court would not need to resort to complex calculations. Each class member signed IPAs with similar, if not the same, terms, and the amount of the loan

obligations can be determined without difficulty. *Compare Simms v. Jones*, 296 F.R.D. 485, 504 (N.D. Tex. 2013), *aff'd*, *Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) ("Given that damage calculations will require the most intense and complex inquiries, the Court finds the issue of damages predominates over the common issues surrounding contract interpretation and breach."); *see Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) (affirming class certification despite "the necessity of individualized inquiry into each plaintiff's injury to determine damages").

## 2.  Superiority

This requirement is met where "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).  Class actions are superior when individual actions would be wasteful, duplicative, or adverse to judicial economy. *Mullen,* 186 F.3d at 627.  Other relevant factors include "(A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum."[4] *Ibe*, 836 F.3d at 529–30 (citing FED. R. CIV. P. 23(b)(3)).

Although the Lenders filed debt collection suits against some class members in other fora, this class action provides an opportunity to efficiently resolve all claims.  Individually litigating each physician's claim against Defendants would be a waste of judicial resources, given that class members share many common, dispositive issues of law and fact.  Furthermore, many class members would have little incentive to individually litigate their claims outside this class action, as their debt obligations are relatively small; Dr. Khan and Dr. Obiesesan testified that they chose not to opt out given the expense of litigating on their own.  *See Castano v. Am.*

---

[4] In certification of a settlement class, the Court need not inquire "whether the case, if tried, would present intractable management problems" under Rule 23(b)(3)(D).  *Amchem*, 521 U.S. at 620.

*Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (noting that a "negative value" suit, in which a plaintiff seeks a relatively low amount of damages such that the costs of litigation would not justify the end result, is the "most compelling rationale for finding superiority").

### III.    Approval of Class Settlement

A court must review any "settlement, voluntary dismissal, or compromise" of the "claims, issues, or defenses of a certified class." FED. R. CIV. P. 23(e).  Rule 23(e) establishes certain procedures in considering a proposed settlement, each of which will be considered in turn:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

*Id.*

#### a.   Notice Must Be Directed in a Reasonable Manner to All Class Members

There are "no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e) requirements." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005).  Instead, "a settlement notice need only satisfy the broad reasonableness standards imposed by due process." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (internal quotation marks omitted).  Due process is satisfied if the notice provides class

members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *Id.*; *see also Wal–Mart Stores*, 396 F.3d at 114 (explaining that "the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings").

Notice of the settlement was reasonable and provided ample due process. Notice was disseminated through the procedures provided in the Court's November 22, 2017, Order preliminarily approving class settlement. (ECF No. 64). The notice described, in plain and easily understood terms, (1) the nature of the claims, issues, and defenses to be decided, as well as the effect of a potential class settlement, (2) the scope of the settlement class and subclasses, (3) the date and time of the fairness hearing, and (4) the rights of the class members to object or opt out of the settlement. *See also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977) (requiring notice to "contain an adequate description of the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by the average absentee class member"). The notice also provided a telephone number and a website through which class members could obtain more detailed explanations. No class member objected to the form or content of the notice.

In terms of timing, class members had at least 61 days between the initial mailing of the notice and the deadline to request exclusion from the class.[5] *See DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935, 946 (10th Cir. 2005) (notice program upheld as providing sufficient due process even though 70.7% of the class members received fewer than thirty-two days' notice); *Silber v. Mabon*, 18 F.3d 1449, 1452, 1454 (9th Cir. 1994) (due process requirement and Rule 23 satisfied when settlement notices were sent out forty days before the

---

[5] The last notices were mailed on December 27, 2017. The deadline to request exclusion from the class was February 26, 2018. (ECF No. 64).

opt-out deadline).  Furthermore, the fairness hearing was scheduled at least 75 days after the notice date.  *See Schwartz*, 2005 WL 3148350, at *11 (N.D. Tex. Nov. 8, 2005) (stating that a gap of 62 days between when notice was first sent out and the fairness hearing was adequate).

The Court recognizes that, in some instances, the settlement could result in class members having judgments entered against them for less than the debt on the IPAs without having received actual notice.  However, due process does not require actual notice to each party intended to be bound by a class settlement.  *Mullane v. Cent. Hanover Bank & Trust. Co.*, 339 U.S. 306, 313–14 (1950); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) ("[T]he question before us today is not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement.").  A class member who later claims that he did not receive adequate notice and therefore should not be bound by the settlement can litigate that issue on an individual basis.  *Id.*

### b.  The Proposed Settlement Must be Fair, Reasonable, and Adequate

Courts evaluate the *Reed* factors to determine whether a proposed settlement is fair, reasonable, and adequate.  *See Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).  The *Reed* factors are: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.  *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).  For the reasons stated below, the proposed settlement is fair, reasonable, and adequate.

### i.  Evidence that the Settlement Was Obtained by Fraud or Collusion

Nothing in the record indicates that the settlement was the result of secret negotiations or improper collusion.  Evidence indicates that the settlement was negotiated at arms' length over the course of several months and aided by a full-day mediation with an experienced mediator.  (Massey Decl. ¶¶ 3-4, 68-75, 79); *see also Quintanilla v. A & R Demolition Inc.,* 2007 WL 5166849, at *4 (S.D. Tex. May 7, 2007) (holding a class action settlement to be free of fraud or collusion when "[t]he settlement was reached through arms-length negotiations after a long, hard-fought mediation with a neutral").  Throughout the negotiation process, the parties employed their own teams of attorneys, consultants, and experts to assess the validity of the allegations underlying Plaintiffs' claims.

## ii.  Complexity, Expense, and Likely Duration of the Litigation

Plaintiffs' Amended Complaint raises complex legal and factual issues, including the accuracy and materiality of numerous statements.  At a minimum, continued litigation would take a significant amount of time and expense associated with written discovery, depositions, the hiring and preparation of experts, motion practice, trial, and possible appeal.  *See Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 652 (N.D. Tex. 2010).  Class members, Defendants, and likely witnesses are geographically dispersed across the Unites States, further increasing the costs of discovery.  The litigation is also likely to be protracted given MHT's Chapter 7 bankruptcy proceedings.  Accordingly, the amount of time it would take to recover on behalf of class members would measure in years rather than months were the Court to disapprove the proposed settlement.  *See Schwartz,* 2005 WL 3148350, at *19 (weighing a potential "delay in the receipt of any relief" in favor of approving a proposed settlement).  The delay is particularly worrisome given that class members' loan obligations are accruing interest.

A swift resolution of this dispute thus will avoid complex and protracted litigation, or, more likely, the proliferation of individual lawsuits between the Lenders and class members.

The settlement overall "foster[s] the goals of certainty, finality and economy, which lie at the heart of our general preference for settlement of class actions." *Schwartz*, 2005 WL 3148350, at *23.

### iii.   Stage of Litigation and Available Discovery

The settlement negotiations were informed by substantial, albeit informal, discovery. *See Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (noting that "the lack of [formal discovery] does not compel the conclusion that insufficient discovery was conducted" for the purposes of settlement approval). Plaintiffs interviewed potential witnesses over the course of several hundred hours, consulted with experts throughout the litigation, and reviewed thousands of pages of documents obtained from public sources, Defendants, and third parties. (Massey Decl. ¶¶ 3, 32, 34–37, 43–46, 64, 73–74; Massey Supp. Decl. ¶¶ 3–8, ECF No. 107).

This is not a case in which the attorneys were "groping in darkness" trying to reach a settlement without a sufficient understanding of the case. *See Schwartz*, 2005 WL 3148350, at *19; *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 300 (5th Cir. 2017) ("[I]f the record points unmistakably toward the conclusion that the settlement was the product of uneducated guesswork, a court may be acting within its discretion in disapproving the agreement without ever considering whether the agreement's terms are adequate."). At the point the parties reached the settlement, they had "ample information with which to evaluate the merits of the competing positions." *Ayers v. Thompson,* 358 F.3d 356, 369 (5th Cir. 2004).

### iv.   Probability of Plaintiffs Prevailing on the Merits

In analyzing this factor, courts must compare the terms of the settlement with the likely rewards the class would have received following a successful trial of the case. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *Reed*, 703 F.2d at 172. However, because the

very purpose of settlement is to avoid the delay and expense associated with litigation, the Court is not to try the merits of the case. *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971).

Plaintiffs face significant factual and legal obstacles to prevailing on the merits, making settlement desirable. Ascentium's defenses include that (1) there is no evidence that Ascentium made any misrepresentations to class members regarding the viability of the Program or whether class members should participate in the Program; (2) at least seventy potential class members verbally confirmed to Ascentium that they understood their loan obligations under the IPAs; (3) there are no facts supporting the existence of a RICO enterprise or Ascentium's participation in such an enterprise; (4) there are no facts supporting an inference that Ascentium coordinated, collaborated, or otherwise associated with MHT; (5) Plaintiffs fail to identify any injury resulting from Ascentium's alleged use of racketeering income; and (6) Ascentium could not have participated in a RICO conspiracy with MHT because Ascentium was also the victim of MHT's alleged fraud. (*See* ECF No. 95 at 8–12).

These challenges have serious potential merit and go to the heart of Plaintiffs' claims against the Settling Defendants. However, there remains a substantial risk for Plaintiffs in proceeding to trial and recovering on their claims, which strongly favors settlement. Review of the circumstances here demonstrates that the concrete monetary and injunctive benefits of the proposed settlement far outweigh Plaintiffs' uncertain prospects of success if this case were to be litigated.

### v. Range of Possible Recovery and Certainty of Damages

This factor focuses on whether the settlement falls "within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits." *Klein*, 705 F. Supp. 2d at 656. Courts compare the recovery for the class under the proposed agreement with the likely estimated value of the claims if they went to trial. *Id.* The fact that a proposed settlement may

"only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Parker*, 667 F.2d at 1210 n.6; *see also In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving a settlement representing two percent of aggregated expected recovery).

The settlement in this case falls well within the range of reasonableness. Of the $52 million that class members collectively owe under the IPAs, Ascentium and Univest have agreed to release class members from $37 million. (*See* Massey Decl. at ¶ 4). This represents a loan forgiveness of over 70%. While many of the class members individually agreed to pay upwards of $458,136 through the Program, none of the class members will pay close to that amount under the settlement. Even members of Subclass Four, who are indebted to Balboa, will receive cash payments based on a formula set forth in the Stipulation, which will amount to an award of tens of thousands of dollars for each member of that subclass. (ECF No. 59-1 § 22.C). Given that there is a significant risk that class members would have to pay the full balance due under the IPAs as well as late fees and interest charged thereunder, the settlement is an immediate and substantial benefit for the class members.

Other courts have approved similar class settlements, where the class members agree to release claims in exchange for debt forgiveness. *See, e.g.*, *F.C.V., Inc. v. Sterling Nat. Bank*, 2006 WL 1319822, at *7 (D.N.J. May 12, 2006).[6] The settlement in this case provides

---

[6] *F.C.V., Inc. v. Sterling National Bank* is particularly similar to this case. NorVergence, Inc. represented to class members that it could reduce the cost of telecommunications services through proprietary equipment. 2006 WL 1319822, at *1. Class members entered into equipment rental agreements with NorVergence, agreeing to make monthly payments. *Id.* at *2. The agreements were then assigned to Sterling National Bank. *Id.* It later became evident that NorVergence's equipment provided little or no value. *Id.* When NorVergence filed for bankruptcy, Sterling sought to recover against class members for amounts due under the rental agreements. *Id.* at *3. Plaintiffs countered that the rental equipment and agreements were "part of an elaborate scheme to defraud." *Id.* at *2.

Under the proposed settlement, Sterling reduced each class member's balance due by 33% and forgave late fees, attorneys' fees, and other costs. *Sterling*, 2006 WL 1319822, at *3, *7. 161 of the 274 potential class members ended up opting out, some of them noting that as victims of the fraud, they should not be obligated to pay any amount to Sterling. *Id.* at *4-*5. Despite some class members still being required to "pay tens of thousands of dollars" to Sterling, the court found the settlement fair, reasonable, and adequate. *Id.* at *6.

equivalent, if not more substantial, relief to class members.  *See Holman v. Student Loan Xpress, Inc.*, No. 8:08-cv-305-SDM-MAP (M.D. Fla. Jan. 4, 2011) (approving settlement that reduced the class members' debts by amounts ranging between 20% and 75% of each class member's outstanding loan obligations); *F.C.V., Inc. v. Sterling National Bank*, 2006 WL 1319822 (D.N.J. May 12, 2006) (approving debt forgiveness in the amount of 33% of the balance due); *see also In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002); *Smith v. CRST Van Expedited, Inc.*, 2013 WL 163293, at *1 (S.D. Cal. Jan. 14, 2013); *Cosgrove v. Citizens Auto. Fin., Inc.*, 2011 WL 3740809, at *1 (E.D. Pa. Aug. 25, 2011); *Whitaker v. Navy Fed. Credit Union*, 2010 WL 3928616, at *1 (D. Md. Oct. 4, 2010).  Furthermore, class members may still recover more from Defendants not covered by this settlement, although the Court recognizes the potential difficulty of recovering any judgment from MHT given its bankruptcy.  *Stott*, 277 F.R.D. at 346 (finding relevant that class members "may be able to obtain an additional recovery from [defendants] not released by this settlement").

The proposed settlement also provides injunctive relief to the class members and a release from any other claims that Ascentium and Univest could otherwise pursue against them under the IPAs.  *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) (holding that federal court may approve settlement that releases state law claims).  These provisions prevent Ascentium and Univest from engaging in the same types of debt collection and credit reporting activities described in their Amended Complaint as to the debt owed prior to the settlement.

Overall, the recovery allowed under the settlement compares favorably with recoveries in similar class settlements, and when the expected recovery in this case is discounted for the obstacles to the class succeeding on the merits, the settlement is fair, reasonable, and adequate.

### vi.  Opinions of Class Counsel, Class Representatives, and Absent Class Members

In a case like this one, where the parties have conducted an extensive investigation, engaged in significant fact-finding, and class counsel is experienced in class action litigation, courts typically "defer to the judgment of experienced trial counsel who has evaluated the strength of his case." *Schwartz*, 2005 WL 3148350, at *21; *see also Cotton*, 559 F.2d at 1330 ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."). Class counsel and the representative Plaintiffs have all endorsed the proposed settlement as a substantial achievement and recovery for class members. (ECF Nos. 101-05). Two representative Plaintiffs, Dr. Derek Melby and Dr. David Guillot, testified at the fairness hearing that they thought the settlement was fair, reasonable, and adequate. Class counsel aver that the parties have negotiated the best settlement that they could obtain under the circumstances. (ECF No. 90 at 21). A small number of objections have been received, which the Court will discuss in detail below, but the overall opinion of the proposed settlement has been positive.

### c. Parties Seeking Approval Must File a Statement Identifying Any Agreement Made in Connection with the Proposal

"The spirit of [Rule 23(e)(3)] is to compel identification of any agreement or understanding," written or oral, "that might have affected the interests of class members by altering what they may be receiving or foregoing." *Slipchenko v. Brunel Energy, Inc.*, 2015 WL 338358, at *6 (S.D. Tex. Jan. 23, 2015) (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.631 (2004)). The parties have satisfied this requirement by filing the Stipulation of Settlement, which publicly discloses the terms of the settlement. (ECF No. 59-1).

### d. Additional Opt-Out Opportunity

Rule 23(e)(4) provides that "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to

request exclusion to individual class members who had an earlier opportunity to request
exclusion but did not do so."  This only applies "when the opt-out opportunity expired before the
members received notice of a proposed settlement."  *Slipchenko*, 2015 WL 338358, at *7.  This
factor is inapplicable here because the members of the class received notice of the settlement
well before the opt-out opportunity expired.

### e.  Class Member Objections

Class members must be provided an opportunity to object to the proposed settlement.
FED. R. CIV. P. 23(e)(5).  While not dispositive, "[c]ourts have taken the position that one
indication of the fairness of a settlement is the lack of or small number of objections."  *In re Oil
Spill*, 910 F. Supp. 2d at 938.  The presence of objectors does not necessarily defeat a settlement,
and approval can be given even if a significant portion of the class objects.  *Klein*, 705 F. Supp.
2d at 661; *see also Reed*, 703 F.2d at 174 (affirming the district court's approval of a settlement
despite "the objections of twenty-three of twenty-seven named plaintiffs and nearly forty percent
of the 1,517 member class").  It is not the number of objectors, but the quality of their opinions,
that guides the court's review.  *See Jones v. Singing River Health Servs. Found.*, 865 F.3d 285,
300 (5th Cir. 2017).

Of the 207 class members, eleven have objected to the settlement.[7]  Their objections fall
under three categories: (1) that the tax implications of the loan forgiveness are unclear, (2) that
the loan obligations due under the settlement are too high, and (3) that the settlement provided
disproportional benefits to some class members.  For the reasons stated below, the objections are
**OVERRULED**.

First, concerns about the tax consequences of the settlement have been addressed by an
outside accountant, who opined that the class members "should not have a tax consequence as a

---

[7] To the extent any objections have been later withdrawn, the Court approves the withdrawal.  (*See* Dr. Aurand Not.,
ECF No. 85 (indicating that his objections be withdrawn and that he be opted-out of the settlement instead).

result of the forgiveness or discharge of the alleged Ascentium and/or Univest guarantees" and that interest "paid or accrued within the taxable year on indebtedness" could be deducted.  (*See* ECF No. 91 at App. 39–40).

Second, the objectors argue that the settlement should have resulted in greater monetary relief for the class; they urge the court to rewrite the settlement to reduce the negotiated loan obligations.  The structure of the settlement is of concern to the Court.  Never before has the Court been asked to approve a settlement in a class action case where the plaintiffs sued for fraud and the class members are being obligated to pay the defendants, albeit in a reduced amount.  Furthermore, there are very few cases considering the approval of this type of settlement.  However, the inherent nature of any settlement is to reach a compromise.  *Klein*, 705 F. Supp. 2d at 656 ("Parties give and take to achieve settlements.  Typically neither Plaintiffs nor Defendants end up with exactly the remedy they would have asked the Court to enter absent the settlement.").  The objections, while important, do not take into account the full context of the process that produced this settlement and the circumstances of the case.  Courts evaluate the overall fairness and adequacy of a proposed settlement as a whole, and in light of all of the circumstances.  *See also Vaughn v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 749 (E.D. Tex. 2007) ("A claim that a class should have gotten more is easy to make, but the test of a settlement's fairness is whether it reflects a reasonable compromise of the claims asserted.").  Review of the circumstances here demonstrates that the benefits of the proposed settlement far outweigh the likely costs and Plaintiffs' uncertain prospects of recovery if this case were to be litigated.  The settlement provides class members with a favorable measure of recovery, and the objectors do not meaningfully address what more class counsel could have reasonably

accomplished under the circumstances.[8]  Indeed, the class members who testified at the fairness hearing averred that the proposed settlement is preferred over no settlement at all given the costs of litigating individually.

Furthermore, contrary to the objectors' assumptions, courts do not modify proposed settlements just because objectors prefer to pay less or receive more.  The Court is not authorized to make changes that, in its judgment, might lead to a "better" settlement.  *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998) ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness. Neither the district court nor this court have the ability to delete, modify, or substitute certain provisions.").

Third, the objectors argue that the settlement provides disproportional relief to certain class members.  "[A] class action settlement need not necessarily treat all class members equally."  *Cohen v. Resolution Tr. Corp.*, 61 F.3d 725 (9th Cir. 1995), *vacated on other grounds by* 72 F.3d 686 (9th Cir. 1996).  Class counsel intended for the different subclasses to receive different treatment based on each class member's outstanding financial obligations under the IPAs, (ECF Nos. 91, 119), and the methodology used in distributing the reduction was appropriate and reasonable.  *See also Schwartz*, 2005 WL 3148350, at *24 (approving a plan of allocation where each class member's recovery is "based on not only [his] legal damages, but

---

[8] Furthermore, for those objectors unhappy with the settlement, "their remedy was simple: opt out."  *In re Oil Spill*, 910 F. Supp. 2d at 938 ("The court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member . . . had the right (and the means) to opt out and pursue its individual claims without disturbing the settlement for the rest of the class."); *see also Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012) ("Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair.").

also on [his] actual losses recognizing the facts and circumstances of this case).[9]  Furthermore, the definition of the subclasses did not unfairly benefit the representative Plaintiffs; there was at least one representative Plaintiff in each of the four subclasses.

## IV.    Conclusion

For the reasons stated above and on the record, Plaintiffs' Motion for Final Approval of Partial Class Action Settlement is **GRANTED**.  Because the settlement resolves all claims between Plaintiffs and Settling Defendants, a final judgment will be entered accordingly.  An order adjudicating the motions for award of attorneys' fees and expenses, (ECF Nos. 92, 110), will also be entered accordingly.

SO ORDERED.

June 22, 2018.

BARBARA M. G. LYNN
CHIEF JUDGE

---

[9] *See also Petruzzi's, Inc. v. Darling–Del. Co.*, 880 F. Supp. 292, 300-01 (M.D. Pa.1995) ("[D]isparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages"); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 654 (E.D. Va. 2001) (approving plan of allocation that "sensibly makes interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue"); *In re Aetna Sec. Litig.*, 2001 WL 20928, at *12 (E.D. Pa. Jan.4, 2001) (approving plan of allocation that "acknowledges the differing losses suffered by Claimants depending on the dates on which they purchased and sold Aetna stock and the price at which they may have sold the shares").